UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:                                                              Chapter 11

208-214 E. 25th St. LLC,                                    Case No. 22-11610-JLG

                                    Debtor.
-----------------------------------------------------------x

**DECLARATION OF STEVEN CROMAN IN OPPOSITION TO THE
NOTE BUYER'S MOTION TO DISMISS THE CHAPTER 11 CASE**

Steven Croman declares the following under penalties of perjury pursuant to 28 U.S.C. § 1746:

1. I am the manager and beneficial majority member of 208-214 E. 25th St. LLC (the "Debtor") and have been involved with the operations of the Debtor's buildings since acquisition in 2001. As such, I am fully familiar with the facts and circumstances set forth herein and respectfully submit this Declaration in Opposition to the motion of 25th Street Multifamily LLC (the "Note Buyer") seeking to dismiss this Chapter 11 case.

2. In submitting this Declaration, I want to emphasize that the Debtor filed this Chapter 11 case in good faith to be in a position to address what can only be characterized as runaway default interest occasioned by a minor payment deficiency in June and July 2021. I was not even aware of this deficiency until receipt of an acceleration notice on or about August 12, 2021 issued in connection with the simultaneous sale of the mortgage debt to the Note Buyer. From that point forward, the Note Buyer's demand for receipt of all default interest plus other fees, now totaling over $7.0 million, has greatly impeded my effort to resolve or refinance the debt.

3. I raised various equitable defenses in the state court which are pending and place in dispute the Note Buter's entitlement to default interest. I am also mindful of the approaching

maturity date on April 10, 2023. Accordingly, the Debtor filed its Chapter 11 petition to implement a plan that pays all acknowledged claims of principal and non-default interest in full while creating an escrow for the disputed portions of the claim relating to default interest pending a determination as to entitlement on a post-confirmation basis. I pursued a refinancing pre-petition and I am renewing those efforts with the goal of being able to file a viable plan of reorganization in short order, and certainly before the return date of this Motion.

4.   The proof, as they say, is in the pudding, but the fact remains that the Debtor is being squeezed by a relentless Note Buyer which is attempting to capitalize on a relatively minor payment deficiency to charge exorbitant default interest at $455,000 per month.

5.   My understanding is that Chapter 11 is a proper forum to address and reinstate mortgage debt even over the objection of a secured lender. This Declaration is designed to clarify certain facts to support the good faith of the filing with due recognition that this case principally concerns a dispute between the Debtor and the Note Buyer.

**Background**

The Debtor was organized in 2001 to acquire four separate but adjoining multi-family walk-up apartment buildings in the Kip's Bay neighborhood of Manhattan with a total footprint of 40,300 square feet, The buildings are located at 208 East 25th Street (21 units); 210 East 25th Street (22 units); 212 East 25th Street (22 units); and 214 East 25th Street (20 units) (collectively, the "Buildings"). The Buildings are at or close to full occupancy with a current total rent roll of $269,719.17 per month. A copy of the Rent Roll as of the Chapter 11 filing is annexed hereto as <u>Exhibit</u> "A".

6.      Based upon annual rents of about $3.25 million per year, the Debtor scheduled the Buildings with a value of approximately $30 million (approximately ten (10) times annual rents), although rising interest rates have taken their toll on real property values.

7.      On or about March 30, 2016, the Debtor refinanced the then-existing mortgage through a restated mortgage note with BankUnited, N.A. (the "Original Lender"), the Note Buyer's predecessor-in-interest, for the sum of $25,000,000 (the "Note"). A copy of the Note is attached hereto as Exhibit "B". The Note required payments of debt service with a 3.4% per annum contract rate of interest and an April 10, 2023 maturity date. The loan was secured by a mortgage lien on the Buildings pursuant to a certain a "Consolidation and Extension Agreement" (the "Mortgage"). The Note and Mortgage and supporting papers executed therewith are collectively referred to as the "Loan Documents."

8.      Pursuant to the Note, the Original Lender was to withdraw the monthly payments from Debtor's operating account maintained at BankUnited on the tenth day of the month in the sum of $113,763.28, consisting of the payment of principal and interest.

9.      This happened, without fail for the next five years. Notwithstanding the loss of income suffered by the Debtor (and virtually every other landlord) due to the pandemic, we always made sure that there were sufficient funds in the operating account to cover the sweep each month, even if it meant having to advance the funds, without ever requesting a moratorium from the Original Lender.

10.     On June 10, 2021, the balance in the operating account was insufficient to cover the debt service of $113,763.28 and an escrow payment of $87,271.32. Rather than provide me

with notice or withdraw what funds were available, the Original Lender took no monies from the account.[1]

11. My management company did not initially detect from the June statement that the sweep was not made. There is no indication that a notice of default was served upon the Debtor, myself or the management company.

12. In July, there again was an insufficient balance to cover the monthly debt service, and apparently no withdrawal of any amount was made, and again, no notice of default was given.

13. Then on August 2, 2021, the Original Lender withdrew the sum of $201,184.60 and credited the June payment for debt service and escrow, together with a $150 service fee.

14. By email dated August 4, 2021, William Freese, on behalf of the Debtor's management company, inquired of the Original Lender as to the reason for the withdrawal. The Original Lender responded by email one week later on August 11, 2021, explaining that "The amount of $201,184.60 was debited in accordance with the loan documents to cover the monthly installment that was due on June 10, 2021, without waiver of any of the bank's rights under the loan documents." A copy of the email exchange is annexed hereto as Exhibit "C". Importantly, no mention was made of any alleged default, or the fact that monies were still owed for July and August.

15. That same day, August 11, 2021, formal notice was given for the first time to the Debtor by means of a combined default and acceleration notice (the "Default Notice") sent by the Original Lender via Federal Express and certified mail stating that there were defaults under

---

[1] I previously indicated that partial payments had been made in connection with the short falls. This was based on our understanding the Original Lender withdrew various funds available in the account in June. It now appears that the June 10 payment was swept on August 2, 2021.

4

the Mortgage that "remain uncured" even though no prior notice to cure had been provided. The Default Notice further stated that the entire loan was being accelerated and that interest was being raised immediately to the 24% default rate. A copy of the Default Notice is annexed hereto as Exhibit "D".[2]

16. Also that same day, the Original Lender assigned the Loan Documents to the Note Buyer. While the Note Buyer has attached copies of many loan, collateral and assignment documents to the Motion, it is certainly noteworthy that the Note Buyer neither attached nor produced a copy of the actual Sale Agreement with BankUnited. However, the existence of a Sale Agreement dated August 11, 2021 (the same day as the acceleration) is referenced in the recitals to the Omnibus Assignment of Loan Documents which itself is notarized on August 11, 2021 and then made effective as of August 12. *Compare*, copies of the acceleration letter dated August 11, 2021 and the Omnibus Assignment of Loan Documents, annexed hereto as Exhibits "F" and "G", respectively.

17. The next day, on August 12, 2021, the Note Buyer transmitted a letter to the Debtor via overnight courier advising that the Note and Mortgage had been assigned, enclosing a "hardship declaration form" for the Debtor to sign and return (the "Hardship Declaration"), and advising that "a person or entity who owns commercial real property as defined in the ACT and has suffered financial hardship during the COVID-19 pandemic and has submitted a Hardship Declaration form … cannot be subject to the commencement of a mortgage foreclosure action until at least August 31, 2021." Copies of the letter and the Hardship Declaration are collectively annexed to the Croman Declaration as Exhibit "H".

---

[2] It also appears that, before accelerating the debt, the Original Lender swept the operating account one last time and withdrew $97402.38, which it applied to interest. *See* Account Statement annexed hereto as Exhibit "E".

18. The letter and the Hardship Declaration were received by the Debtor on the afternoon of August 13, 2021, by which time a foreclosure action had already been commenced by the Note Buyer in the Supreme Court, New York County, Index No. 850189/2021 (the "Foreclosure Action"). A copy of the legal docket for the Foreclosure Action is annexed hereto as Exhibit "I".

19. Thus, I first learned of the missed payments, the default, the acceleration of the debt, and the assignment of the Loan Documents to the Note Buyer all within the space of about 24 hours on August 12 and 13, 2021, at virtually the same time that the Foreclosure Action was being commenced without any opportunity to cure the default.

20. After investigating what had happened, we learned that the management company, which is an entity owned by me[3], failed to maintain a proper oversight due to staffing issues caused by COVID-19. That entity manages numerous buildings throughout the city and, *inter alia*, is in charge of ensuring that funds are deposited into the appropriate accounts for each building so that the respective lenders are able to timely debit same to pay debt service. However, because of employees working from home, and several employees being furloughed and even laid off, as a result of the COVID-19 crisis, coupled with the company's C.F.O. having been recently replaced, there was unfortunate confusion as to who was responsible for ensuring that the operating account from which Original Lender would withdraw the monthly payment was sufficiently funded and that responsibility fell through the cracks.

21. The repercussions of this simple oversight have been far beyond what could reasonably have been expected. More than enough money passed through the accounts during

---

[3] The Note Buyer has made much in various filings of my ownership of the management company, as though I am fully aware at all times of everything that happens at every level in every one of my companies. I rely on the people who work for me, but I also I negotiated for notice provisions directed to my attention in the Loan Documents.

the months of June and July to cover the payments (including a $198,000 deposit made on June 30, 2021), but the Original Lender did not make any partial withdrawals or provide specific notice of the deficiency beyond a single line item in a routine statement.

22. Once a potential problem was identified, it took the Original Lender a full week to respond, by which time the default and acceleration had been noticed and interest jumped seven fold from 3.4% to 24%.

23. Obviously, given our prior success in maintaining the proper balance in the account despite the financial crisis caused by Covid-19, we could and would have immediately covered the shortfall had we realized that there was an issue.

24. In fact, on or about September 21, 2021, the Debtor tendered three checks to the Note Buyer, representing the interest and principal due for July, August and September, together with the five (5%) percent late fee contemplated by the Mortgage. However, by letter dated September 30, 2021, the Note Buyer rejected the tender, insisting on payment of the full accelerated amount of the mortgage debt. A copy of the rejection letter is annexed hereto as Exhibit "J".

25. Shortly thereafter, by notice dated October 11, 2021, the Debtor moved to dismiss the complaint on the ground that the acceleration of the debt without notice and an opportunity to cure, resulting in a 700% increase in the interest rate, was unconscionable, and asking that the Court enter an order compelling the Note Buyer to accept a cure and reinstatement of the mortgage.

26. In its Decision, a copy of which is annexed hereto as Exhibit "K", the Court noted that "Equity may intervene to prevent a substantial forfeiture occasioned by a trivial or technical

breach, or where the default consists of a good faith mistake, promptly cured by the defaulting party, and where there is no prejudice to the creditor." *See,* Exhibit "K" at p. 3.

27. However, the Court also explained that the issue required an evidentiary hearing and could not be resolved on a motion to dismiss at the pleading stage, thereby denying the motion while reserving the issue for another day. The Court further noted that it had no authority under state law to compel the Note Buyer to accept a cure and reinstatement.

28. The issue was raised again by the Debtor in connection with the Note Buyer's March 29, 2022 motion for summary judgment, which motion is fully briefed but had not been decided by the time the Chapter 11 case was commenced.

29. The Debtor had hoped to refinance and payoff the entire debt, but the refinancing was thwarted by the Note Buyer's continued refusal to accept payment of the undisputed portion of the debt. More specifically, last summer the Debtor obtained a $25 million refinancing term sheet from Northwind Group, a copy of which is annexed hereto as Exhibit "L". The Debtor was negotiating loan documents at significantly higher rates than the original mortgage, only to be stymied by the Note Buyer's insistence on receipt of approximately $5,647,732.14 in default interest and other charges as of August 15, 2022 pursuant to the pay-off letter annexed hereto as Exhibit "M". Without an agreement on default interest, the refinancing opportunity was lost.

30. Then interest rates began to climb, squeezing the Debtor from two sides, since the cost of refinancing became unattractive while at the same time interest continued to accrue at an alarming rate of more than $455,000 per month.

31. Accordingly, the Debtor filed for Chapter 11 relief to give itself an opportunity to propose a plan to cure and reinstate the mortgage, which I have been advised is permitted under the Bankruptcy Code. A reorganization in bankruptcy will provide a mechanism for the payment

of undisputed debt and stopping the continued accrual of interest by the escrowing of the disputed portion of the debt which, as noted in the State Court's Decision, is not available under state law.

32. In its Motion to Dismiss, the Note Buyer ignores this goal and instead charges without any supporting evidence that the Chapter 11 case was filed to stay the state court from ruling on a motion for contempt in which it was alleged that Debtor and I were not cooperating with the Receiver. To the contrary, we cooperated with the Receiver in the Foreclosure Action, as detailed in my affidavit in opposition to the contempt motion, a copy of which is annexed hereto as Exhibit "N". Moreover, we consented to the retention of the Receiver during the Chapter 11 case as a continued sign of our good faith efforts to cooperate.

33. The Note Buyer also challenges the Debtor's ability to confirm a plan which, according to the Note Buyer, will require as much as $11.5 million to cure and reinstate the mortgage, as well as another $20 million or so to pay off the loan at maturity in April 2023, including the escrowing of the disputed portion of the Note Buyer's claim.

34. As noted above, the Debtor previously began seeking refinancing of as much as $25 million, but abandoned the effort when the Note Buyer insisted on payment in full, including all disputed interest, and it became apparent that we could not compel partial payment and creation of an escrow in the context of the Foreclosure Action.

35. We believe that Chapter 11 provides a path forward that will protect our rights to challenge the Note Buyer's entitlement to interest while protecting the Note Buyer's ability to receive payment on account of the undisputed portions of the claim. While refinancing is not as easy as it was early last year, it remains a viable tool to raising the necessary monies to fund a plan.

36.    As far as my family's financial wherewithal to raise sufficient cash and complete a refinancing in the time allotted is concerned, we have the resources to do so. The relevant financial information will be provided as part of a disclosure statement, but it suffices to say that my family owns or controls some 150 apartment buildings in the City of New York and has access to both cash and sources of asset-based lending sufficient for the intend plan of reorganization.

37.    For all of the above reasons, I respectfully submit that the Chapter 11 case was filed in good faith to use certain statutory provisions contained in the Bankruptcy Code that are not otherwise available to the Debtor outside of bankruptcy, and that the Debtor will be able to effectuate a timely and expeditious reorganization as outlined herein if afforded the opportunity. Accordingly, the motion to dismiss should be denied.

Dated: New York, NY
    January 24, 2023

_____
Steven Croman