UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

In re:

208-214 E. 25th St. LLC,

                             Debtor.

----------------------------------------------------------x

Hearing Date and Time:
February 14, 2023 @ 10:00 a.m.

Chapter 11

Case No. 22-11610 (JLG)

## DEBTOR'S MEMORANDUM OF LAW IN OPPOSITION TO THE NOTE BUYER'S MOTION TO DISMISS CHAPTER 11 CASE

Goldberg Weprin Finkel Goldstein LLP
*Attorneys for the Debtor*
125 Park Avenue -- 12th Floor
New York, New York 10017
(212) 221-5700

Kevin J. Nash, Esq.
J. Ted Donovan, Esq.

# TABLE OF CONTENTS

**Page**

Preliminary Statement ...........................................................................................1

    A.    The Equities Favor the Debtor...........................................................3

    B.    The Chapter 11 Case Was Not Filed to Prevent a Foreclosure Sale .................6

    C.    The State Court Foreclosure Action Has Not Cut-Off the Debtor's Rights......7

Legal Argument.....................................................................................................8

    Point I:  The Chapter 11 Case Was Filed in Good Faith ................................8

    A.    The *C-TC* Factors ...........................................................................8

    B.    Objective and Subjective Good Faith ............................................12

        1.    The Intended Reorganization is Based Upon a Legitimate Use of the Bankruptcy Code ...................................................................12

        2.    The Debtor's conduct Meets the Standard of Objective Good Faith.........15

        3.    The Debtor Also Meets the Standard of Subjective Good Faith ...............17

Conclusion ..........................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page**

*Fifty States Management Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573 (1979) ...............8

*Graf v. Hope Bldg. Corp.*, 254 N.Y. 1, (1930) ........................................................................8

*In re 53 Stanhope LLC,* 625 B.R. 573 (Bankr. S.D.N.Y. 2021), *appeal dismissed,*
2022 WL 3025930 (S.D.N.Y. Aug. 1, 2022).......................................................... 7-8

*In re 68 West 127th Street LLC*, 285 B.R. 838 (Bankr. S.D.N.Y. 2002)...............11, 12, 13, 17

*In re 234-6 W. 22nd St. Corp.*, 214 B.R. 7517 (Bankr. S.D.N.Y. 1997) ..................................9

*In re C-TC 9th Avenue Partnership*, 113 F.3d 1304 (2d Cir. 1997).................... 2, 9-10, 11, 12

*In re Century/ML Cable Venture*, 294 B.R. 9 (Bankr. S.D.N.Y. 2003) .................................9

*In re Clinton Centrifuge, Inc.*, 72 B.R. 900 (Bankr. E.D.Pa. 1987) ........................................13

*In re Consolidated Distributors, Inc.*, 2013 WL 3929851 (Bankr. E.D.N.Y. 2013)...........9, 11

*In re D&G Construction Dean Gonzalez, LLC*, 635 B.R. 232 (Bank. E.D.N.Y. 2021)....16, 17

*In re Hartford & York LLC*, 2014 WL 985449 (Bankr. E.D.N.Y. March 13, 2014) ..............11

*In re Johns-Manville Corp.*, 36 B.R. 727 (Bankr. S.D.N.Y. 1984)...........................................9

*In re Kingston Square Assocs.*, 214 B.R. 713 (Bankr. S.D.N.Y. 1997) .................................12

*In re PPI Enterprises (U.S.) Inc.,* 228 B.R. 339 (Bankr. D.De. 1998) .......................................3

*In re PPI Enterprises (U.S.) Inc.,* 324 F.3d 197 (3d Cir. 2003) ..........................................3, 14

*In re R & G Properties, Inc.*, 2009 WL 1076703 (Bankr. D. Vt. Apr. 16, 2009) ...................11

*In re RCM Global Long Term Corp. Appreciation Fund Ltd.*, 200 B.R. 514
(Bankr. S.D.N.Y. 1996) ........................................................................................12

*In re Rubin Family Irrevocable Stock Trust*, 2013 WL 6155606 (Bankr. E.D.N.Y. 2013) ....14

*In re RYYZ, LLC*, 490 B.R. 29 (Bankr. E.D.N.Y. 2013)..........................................................11

*In re Sletteland*, 260 B.R. 657 (Bankr. S.D.N.Y. 2001) ...........................................................9

**Cases**                                                                 Page

*In re Sylmar Plaza, L.P.*, 314 F.3d 1070 (9th Cir. 2002) ........................................3, 12, 13, 14

*In re Uptown Bus. Ctr., LLC*, 2013 WL 5636638 (Bankr. S.D. Ind. Oct. 15, 2013)......... 11-12

*In re Walden Ridge Development LLC*, 292 B.R. 58 (Bankr. N.J. 2003)...............................15

*In re Wally Findlay Galleries (New York), Inc.*, 36 B.R. 849 (Bankr. S.D.N.Y. 1984)....16, 17

*In the Matter of Madison Hotel Associates*, 749 F.2d 410 (7th Cir. 1984) .........................3, 14

*Karas v. Wasserman,* 91 A.D.2d 812 (1982)...............................................................................8

**Statutes**                                                              Page

11 U.S.C. §108...............................................................................................................15

11 U.S.C. §362.........................................................................................................11, 12

11 U.S.C. §502...............................................................................................................14

11 U.S.C. §1124........................................................................................................8, 14

208-214 E. 25th St. LLC (the "Debtor"), respectfully submits this Memorandum of Law in Opposition to the motion [ECF Nos. 21 and 22] (the "Motion") filed by 25th Street Multifamily LLC (the "Note Buyer") seeking to dismiss the Chapter 11 case. For the reasons set forth below, the Motion should be denied.[1]

### Preliminary Statement

The Court's initial view that this Chapter 11 case presents a two-party dispute between a property owner and lender is a fair one. On the one hand, the Debtor is a New York limited liability company which owns four adjoining multi-family walk-up apartment buildings in the Kip's Bay neighborhood of Manhattan. The buildings are located at 208 East 25th Street (21 units); 210 East 25th Street (22 units); 212 East 25th Street (22 units); and 214 East 25th Street (20 units) (collectively, the "Buildings"). The Buildings are at or close to full occupancy with a current total rent roll of $269,719.17 per month. A copy of the Rent Roll as of the Chapter 11 filing is annexed to the Croman Dec. as Exhibit "A".

Based upon annual rents of about $3.25 million per year, the Debtor scheduled the Buildings with a value of approximately $30 million (approximately ten (10) times annual rents), although rising interest rates have taken their toll on real property values. Currently, the Buildings remain under the control of a Receiver, which was continued on consent after the Debtor's Chapter 11 filing on November 30, 2022 [ECF No. 20].

On the other hand, the Buildings are subject to a first mortgage lien held currently held by the Note Buyer in the principal balance of $22,751,005.71, plus accrued interest, fees and costs. The Note Buyer is certainly the Debtor's largest, if not the only major creditor, and the reason for bankruptcy. Indeed, the driving force behind the Chapter 11 filing is an urgent need

---

[1] The Declaration of Steven Croman is also being submitted in opposition, and is referenced herein as the "Croman Dec.".

to address highly contested default interest charges of approximately $7 million as of the petition date, arising out of a relatively minor mortgage payment deficiency in June and July of 2021. The Debtor's core reorganization strategy is to formulate a plan that pays the Note Buyer the principal balance plus undisputed non-default interest and reasonable fees in full through a cure and refinance, while establishing reserves for the disputed default interest charges pending a determination as to the Note Buyer's entitlement thereto on a post-confirmation basis.

Given the pending foreclosure action, the Chapter 11 case invites an analysis of good faith under the Second Circuit decision *In re C-TC 9th Avenue Partnership*, 113 F.3d 1304 (2d Cir. 1997) ("*C-TC*"). While the Debtor, like most real estate owners has few unsecured creditors and limited employees, there are a number of mitigating factors that warrant denial of the Motion. Chief among these is that, due to Covid-related circumstances adversely impacting both the Debtor and its management company, Centennial Properties (and likely BankUnited for that matter), an eminently curable deficiency arising during a short two-month period in June and July 2021, has mushroomed into a multi-million dollar default interest claim exceeding $7.0 million, which has wreaked havoc on the Debtor's ability to restructure or refinance the debt.

The acceleration was not triggered by a chronic pattern of default. In retrospect, the deficiencies could have been rectified with a phone call or email from BankUnited to the Debtor or its management company. Actual notice was not given in June and July and, instead, the Note Buyer swooped onto the scene to buy the mortgage so as to position itself to collect runaway default interest at 24% per annum.

The Note was literally assigned the very same day (August 11, 2021) that the entire debt was accelerated. Moreover, the acceleration and sale of the mortgage occurred within a short time of less than ten (10) days' after BankUnited last swept the Debtor's operating account on

2

August 2, 2021 to pay itself $201,034.60. The Debtor found out about the prior deficiencies on or about the same day it learned that its mortgage had been accelerated and sold.

That the Debtor's overall strategy is to invoke the rehabilitative features of the Bankruptcy Code is not bad faith *per se* under several notable Circuit Court decisions. *See, In re Sylmar Plaza, L.P.,* 314 F.3d 1070 (9th Cir. 2002) and *In the Matter of Madison Hotel Associates,* 749 F.2d 410 (7th Cir. 1984). Both decisions confirmed reorganization plans and rejected similar arguments that a cure and reinstatement in the face of a pending foreclosure section constitutes bad faith *per se*. *See, also, In re PPI Enterprises (U.S.) Inc.,* 324 F.3d 197, 211 (3d Cir. 2003) [affirming holding by Bankruptcy Court that "[i]t is not 'bad faith' for debtors to file for bankruptcy in order to take advantage of a particular provision of the Code." 228 B.R. 339, 345 (Bankr. D.De. 1998)].

These decisions, together with the other factors discussed in detail below, lend support to the bona fides of the Chapter 11 filing, as the Debtor can meet the objective and subjective tests under *C-TC*. Accordingly, the Motion should be denied in favor of permitting the Debtor an opportunity to pursue confirmation of a plan within the exclusive period that utilizes the Bankruptcy Code to pay the Note Buyer the undisputed part of its claim for principal and non-default interest, while creating cash escrows to secure the disputed default interest charges pending a final determination thereof.

## A.    The Equities Favor the Debtor

Like many residential apartment owners, the Covid-19 pandemic presented great challenges to the Debtor to maintain both rent collections and payment of debt service. For the most part, the Debtor persevered and remained current with its debt service payments to BankUnited for all of 2020 and well into 2021. However, on June 9, 2021, and unbeknownst to

the Debtor at the time, the Debtor lacked sufficient collections in its operating account to fully pay the June 2021 monthly sweep.

Typically, BankUnited regularly swept the Debtor's account on or about the 10th day of each month to pay itself debt service ($113,763.28) and reserve for taxes ($87,271.32). Not that Covid-19 is an excuse for everything, but in mid-2021 the Debtor's management company was short-staffed, working remotely and rent collections were delayed. There is no evidence, however, that actual contemporaneous written notice of default was ever issued regarding the June and July deficiencies. It was not until BankUnited withdrew $201,184.60 from the Debtor's account on August 2, 2021 and applied the funds to the June payment that the Debtor's management company realized something was amiss. A representative of the Debtor inquired of BankUnited by email on August 4 as to the reason for the withdrawal. It took BankUnited a week, until August 11 to respond by email explaining opaquely that "The amount of $201,184.60 was debited in accordance with the loan documents to cover the monthly installment that was due on June 10, 2021, without waiver of any of the bank's rights under the loan documents." No mention was made of any formal default being called under the loan documents, or the fact that monies were still owed for July and August. A copy of the email exchange is annexed as <u>Exhibit</u> "C" to the Croman Dec.

By this time, a sale of the Note was in process, as on August 11, 2021, the acceleration notice was issued and sent by BankUnited via Federal Express and certified mail stating that there were unspecified defaults under the Mortgage that "remain uncured" even though no prior notice was given.

That very same day (August 11, 2021) BankUnited also assigned the debt to the Note Buyer. While the Note Buyer has attached copies of many loan, collateral and assignment

documents to the Motion, it is certainly noteworthy that the Note Buyer neither attached nor produced a copy of the actual Sale Agreement with BankUnited. However, the existence of a Sale Agreement dated August 11, 2021 (the same day as the acceleration) is referenced in the recitals to the Omnibus Assignment of Loan Documents which itself is notarized on August 11, 2021 and then made effective as of August 12. *Compare*, copies of the acceleration letter dated August 11, 2021 and the Omnibus Assignment of Loan Documents, annexed to the Croman Dec. as <u>Exhibits</u> "F" and "G", respectively.

Given this timing, it that the Note Buyer likely orchestrated the acceleration of the debt as a condition of purchasing the mortgage itself. The Note Buyer's failure to produce the underlying sale agreement only heightens these suspicions and underscores that the Debtor is now involved with an unrelenting Note Buyer.

Two days later, on August 13, 2021, the Note Buyer instituted the foreclosure action without affording the Debtor any notice or opportunity to effect a cure of whatever default existed for July 2021. The next day, on August 12, 2021, the Note Buyer transmitted a letter to via overnight courier advising the Debtor that the Note and Mortgage had been assigned, enclosing a "hardship declaration form" for the Debtor to sign and return (the "Hardship Declaration"), and advising that "a person or entity who owns commercial real property as defined in the ACT and has suffered financial hardship during the COVID-19 pandemic and has submitted a Hardship Declaration form … cannot be subject to the commencement of a mortgage foreclosure action until at least August 31, 2021." Copies of the letter and the Hardship Declaration are collectively annexed to the Croman Dec. as <u>Exhibit</u> "H". The letter and the Hardship Declaration were received by the Debtor on the afternoon of August 13, 2021, by which time the foreclosure action had already been commenced by the Note Buyer.

On or about September 21, 2021, having now understood that payments were in arrears, the Debtor tendered three checks to the Note Buyer, representing the interest and principal due for July, August and September, 5 together the five (5%) percent late fee contemplated by the Mortgage.  However, by letter dated September 30, 2021, the Note Buyer rejected the tender, insisting on payment of the full accelerated amount of the mortgage debt.  *See,* Exhibit "J" to the Croman Dec.

**B.      The Chapter 11 Case Was Not Filed to Prevent a Foreclosure Sale**

Unlike many Chapter 11 real estate filings, the Debtor did not seek Chapter 11 relief to head-off a scheduled or imminent foreclosure sale.  In fact, the State Court has yet to rule on the Note Buyer's motion for summary judgment, which is being actively defended by the Debtors and remains *sub judice* since March 29, 2022.  The Debtor has substantive grounds to challenge the Note Buyer's acceleration claims and defenses to the foreclosure complaint.  Specifically, the Debtor argued that it was unconscionable even among sophisticated parties to accelerate a $22 million mortgage debt based upon a payment deficiency in which no prior notice was received and which was self-correcting in large part when BankUnited swept the Debtor's account to pay itself $201,184.60 on August 2, 2021.

But for the dramatically rising interest rates and an approaching maturity, the Debtor was prepared to continue to litigate the question of default interest in the State Court while it sought out refinance opportunities.  Last summer, the Debtor obtained a $25 million refinancing term sheet from Northwind Group (*See* Exhibit "L" to Croman Dec.) and was negotiating loan documents at significantly higher rates than the original mortgage, only to be stymied by the Note Buyer's insistence on receipt of approximately $5,647,732.14 in default interest and other

charges as of August 15, 2022 pursuant to the pay-off letter annexed to the Croman Dec. as Exhibit "M". Without an agreement on default interest, the refinancing opportunity was lost.

Since that time, market interest rates have continued to rise, requiring the Debtor to be proactive if it hopes of salvage the situation.[2] In bankruptcy, the Debtor intends to renew efforts to obtain a refinancing in conjunction with filing a plan that pays undisputed amounts to the Note Buyer to stop the running of interest under a cure, while making provision to escrow for disputed default interest charges.

**C.    The State Court Foreclosure Action Has Not Cut-Off The Debtor's Rights**

The issues regarding default interest have not yet been determined. Accordingly, there are no *Rooker/Feldman* or collateral estoppel issues impeding the Debtor's rights to challenge default interest, which remains a viable and unresolved issue.

The Debtor moved to dismiss the foreclosure complaint on the ground that the acceleration of the debt without notice and an opportunity to cure, resulting in a seven-fold increase in the interest rate, was unconscionable. While the Debtor could not obtain a dismissal of the foreclosure or a force cure under state law, in its memorandum decision the State Court gave due recognition to the unconscionability doctrine, noting that "[e]quity may intervene to prevent a substantial forfeiture occasioned by a trivial or technical breach, or where the default consists of a good faith mistake, promptly cured by the defaulting party, and where there is no prejudice to the creditor." *See,* Croman Dec., Exhibit "K" at p. 3.

The State Court's observation regarding the defenses is consistent with rulings made by the Hon. Robert D. Drain in *In re 53 Stanhope LLC,* 625 B.R. 573 (Bankr. S.D.N.Y.

---

[2] Between June 2022 when the summary judgment motions were filed and December 31, 2022, the Prime Rate rose from 4.0 to 7.5; the five-year treasury rate rose from 2.92 to 3.99, and the seven-year treasury rate rose from 2.98 to 3.96.

2021), *appeal dismissed,* 2022 WL 3025930 (S.D.N.Y. Aug. 1, 2022).  That case also involved a Maverick Real Estate affiliate which purchased a note to collect on default interest.  As Judge Drain noted:

> New York has long recognized broader equitable exceptions to enforcing the parties' contract with respect to acceleration and non-monetary defaults, however. Generally, courts look to three factors: has the lender suffered actual damages as a result of the default; has the default impaired the lender's security, that is, the collateral securing the debt; and does the default make the future payment of principal and interest less likely? Courts also consider whether the default was inadvertent or insignificant, although in analyzing whether the default was insignificant or, to the contrary, material, they usually apply the foregoing three factors.

*Id.* at 584.  *Stanhope* cited to *Karas v. Wasserman,* 91 A.D.2d 812 (1982), which made reference to the historical significance of Cardozo's dissent in *Graf v. Hope Bldg. Corp.*, 254 N.Y. 1, (1930), and its emergence as the modern view that "the equitable remedy of foreclosure may be denied in the case of an inadvertent, inconsequential default in order to prevent unconscionably overreaching conduct by a mortgagee".  *See, also, Fifty States Management Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 577–78 (1979) ["Generally, where a lease provides for acceleration as a result of a breach of any of its terms, however trivial or inconsequential, such a provision is likely to be considered an unconscionable penalty and will not be enforced by a court of equity."].  In the face of the Debtor's legitimate dispute with the Note Buyer over default interest and the need to refinance, Chapter 11 represents the Debtor's best path to move forward and bring stability to the situation so as to enable the Debtor to obtain a refinancing without an agreed pay-off.  Under a plan, the Note Buyer cannot dictate all of the terms and the Court has the authority to chart a fair balance relating to immediate payment of undisputed amounts and creation of an escrow for the disputed interest claim under 11 U.S.C. §1124.

8

## Legal Argument

## The Chapter 11 Case Was Filed In Good Faith

**A.    The C-TC Factors**

Although the Note Buyer implies that dismissal is nearly a foregone conclusion whenever there is a single asset realty case involving a foreclosure, procedurally, it has been recognized that "the burden is on the movant to prove bad faith, and dismissal for bad faith is to be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances." *In re Century/ML Cable Venture*, 294 B.R. 9, 34 (Bankr. S.D.N.Y. 2003). *See also*, *In re Consolidated Distributors, Inc.*, 2013 WL 3929851 *7, fn. 47 (Bankr. E.D.N.Y. 2013) ["Many courts have held that dismissal on bad faith grounds should be granted sparingly"]; *In re Sletteland*, 260 B.R. 657, 662 (Bankr. S.D.N.Y. 2001) [noting that courts dismiss cases on bad faith grounds sparingly]; *In re 234-6 W. 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997) [same]; *In re Johns-Manville Corp.*, 36 B.R. 727, 737 (Bankr. S.D.N.Y. 1984) [dismissal on bad faith grounds should be granted sparingly, and only upon a clear showing of abuse of bankruptcy process, avoiding an "intense focus on the debtor's motives in filing"].

While the Debtor recognizes the need to address the *C-TC* factors, the burden rests with the Note Buyer to establish proper grounds with evidence and not ad hominem argument or speculation.   The factors themselves are well recognized and include consideration of the following:

(1)    the debtor has only one asset;

(2)    the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

(3)    the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4)    the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

(5)    the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6)    the debtor has little or no cash flow;

(7)    the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

(8)    the debtor has no employees.

*C-TC, supra,* 113 F.3d at 1311.

The Debtor's case stacks up relatively favorably under *C-TC*. To begin with, the Debtor owns multiple buildings (four in total) with separate addresses and tax lots. Although single asset real estate rules will likely apply, strictly speaking, the Court is not dealing with a lone asset. By the same token, the Note Buyer holds far the largest (if not the only major claim in the case) and there is no hiding from this circumstance. Although there is a pending foreclosure action, the core legal issue relating to default interest has not yet been determined. There is no evidence that the Debtor filed the petition to thwart a scheduled foreclosure sale, which is a far-off event under any circumstances. Contested motions as to both summary judgment and alleged contempt have been pending for some time and it cannot be assumed that the Not Buyer will prevail on either motion. In the case of summary judgment, the motion was marked submitted on March 29, 2022, while the contempt motion was marked submitted on July 26, 2022, about four months prior to the Chapter 11 filing. *See,* Foreclosure Action docket, Croman Dec., Exhibit "I".

Financially, the Buildings generate sufficient cash flow to support a refinancing. This is not a situation where the Debtor cannot meet payment of operating expenses. Of note, the post-petition taxes due in January of more than $520,000 were paid and the Receiver is holding substantial funds of at least $1,683,483 after payment of real estates in early January 2023.

In applying the *C-TC* factors it is worth emphasizing that the Court should look to the totality of the situation:

> In applying the *C–TC* factors, the Court will not engage in a mechanical counting exercise" to determine whether the Debtor filed this bankruptcy case in bad faith. These factors are to be considered in the context of the totality of the circumstances and not in a vacuum. No one factor is determinative of good faith and, it is the totality of circumstances, rather than any single factor, that will determine whether good faith exists. (internal quotation marks and citations omitted)

*In re Consolidated. Distributors, Inc., supra*, 2013 WL 3929851 at *7. *See, also, In re Hartford & York LLC*, 2014 WL 985449, *4 (Bankr. E.D.N.Y. March 13, 2014) ["These factors guide courts in considering the question of whether a bankruptcy case has been filed in good faith, and assist courts in assessing the totality of the circumstances. Depending on the situation, one or another factor may have greater weight, and the number of factors on one side or the other of the balance is not, standing alone, determinative of the outcome."]; *In re R & G Properties, Inc.*, 2009 WL 1076703, at *2 (Bankr. D. Vt. Apr. 16, 2009) ["Simply checking off these factors on the list does not prove bad faith."].

Moreover, *C-TC* should not be employed to "automatically doom" real estate cases from the outset. *In re 68 West 127th Street LLC*, 285 B.R. 838, 846 (Bankr. S.D.N.Y. 2002). There Is also support for the proposition that Indeed, because 11 U.S.C. §362(d)(3) provides a 90-day deadline for the filing of a confirmable plan in a single asset real estate case, bad faith should not be considered during that 90 day period. *See, e.g., In re RYYZ, LLC*, 490 B.R. 29, 35 (Bankr. E.D.N.Y. 2013) ["Section 362(d)(3) provides a window of opportunity for Debtors. Section 362 362(d)(3)'s specific, albeit nonexclusive, criteria for stay relief ought to counsel against knee-jerk motions at the outset of the case that merely parrot the elements of "bad faith," or other grounds for relief. just because the case involves single asset real estate."]; *see, also, In re*

11

*Uptown Bus. Ctr., LLC*, 2013 WL 5636638, at *5 (Bankr. S.D. Ind. Oct. 15, 2013) (applying factors similar to those cited in *C-TC*, while noting that "The filing of a chapter 11 case by a single asset real estate debtor is not, by definition, a bad faith filing, given the addition of § 362(d)(3) which contemplates that such filings will occur."].

**B.    Objective and Subjective Good Faith**

The prevailing principle is that good faith should be measured by combining an analysis of objective futility and subjective bad faith to determine whether a reasonable possibility exists that the debtor will emerge from bankruptcy. *See, In re 68 West 127th Street LLC, supra*, 285 BR. at 846 [analyzing *C-TC* and holding that "The critical test of a debtor's bad faith remains whether on the filing date there was no reasonable likelihood that the debtor intended to reorganize and whether there is no reasonable possibility that the debtor will emerge from bankruptcy."]; *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) ["[T]he standard in this Circuit is that a bankruptcy petition will be dismissed if both objective futility and subjective bad faith in filing the petition are found." (emphasis in original)]; *In re RCM Global Long Term Corp. Appreciation Fund Ltd.*, 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996) ["In this Circuit, a petition will be dismissed if both objective futility of the reorganization process and subjective bad faith in filing the petition are found . . . But a court should reach the conclusion that there is no demonstrable ability to reorganize only upon the strongest evidentiary showing."]. *Accord In re Sylmar Plaza, L.P., supra*.

**1.    The Intended Reorganization is Based Upon a Legitimate Use of the Bankruptcy Code**

Here, the evidence does not support a finding of either objective or subjective futility. To the contrary, the Debtor understands the imperative to procure a refinancing that adequately addresses the mortgage debt in a manner consistent with the Bankruptcy Code. That the Debtor

12

was close to completing a pre-petition financing is a strong indication that a renewed refinancing

can be achieved, particularly if the underlying debt is stabilized and there is clarity through the

Bankruptcy Court process as to what is uncontested and needs to be paid immediately, and what

is contested and needs to be escrowed.  There is nothing in the Bankruptcy Code that precludes

the Debtor from attempting to accomplish what it cannot do in the foreclosure action – compel

the Note Buyer to accept payment of the undisputed amount while escrowing for the disputed

portions pending a determination as to entitlement to default interest.

> As Judge Drain explained in *In re 68 W. 127 St., LLC, supra*, 285 B.R. at 844:

> Keeping the primary focus on the permissible uses of the Bankruptcy Code is important because, taken out of context, the exercise of certain rights under the Code that are perfectly legitimate may appear hurtful, even malicious, yet the exercise of a statutory right or remedy should rarely, if ever, be said to be in bad faith.

A similar sentiment was expressed by the Court in *In re Clinton Centrifuge, Inc.*, 72 B.R. 900,

905 (Bankr. E.D.Pa. 1987), which explained that:

> In engrafting the good faith requirement into the Code, courts must be careful not to upset the delicate balance of interests fashioned by Congress under chapter 11. Moreover, to the extent that the concept of good faith exists independent of other Code provisions (such as adequate protection), courts must be vigilant to apply this concept in ways consistent with the legislative policy decisions embodied in these other [Code] enactments.  Thus, in evaluating a debtor's good faith, the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended. When a debtor is motivated by plausible legitimate reorganization (or liquidation) purposes and not solely or predominantly by the mere desire to prevent foreclosure or hinder creditors, bad faith is not present in a chapter 11 case.

As highlighted in the opening section, a similar objection as to good faith was presented in *In re*

*Sylmar Plaza, L.P., supra*, in which the lender challenged the debtor's good faith in connection

with confirmation of the plan, arguing that the plan "was crafted solely to permit the debtors to

13

take advantage of the Bankruptcy Code to profit personally at the expense of a creditor". *In re Sylmar Plaza, L.P., supra,* at *1074.* In rejecting this argument, the Ninth Circuit stated:

> that a creditor's contractual rights are adversely affected does not by itself warrant a bad faith finding. In enacting the Bankruptcy Code, Congress made a determination that an eligible debtor should have the opportunity to avail itself of a number of Code provisions which adversely alter creditors' contractual and nonbankruptcy rights. The fact that a debtor proposes a plan in which it avails itself of an applicable Code provision does not constitute evidence of bad faith".

*In re Sylmar Plaza, L.P., supra,* at 1075 (internal citations and quotation marks omitted).

Similarly, in *In the Matter of Madison Hotel Associates, supra,* the Seventh Circuit upheld the confirmation of a plan finding that the use of Section 1124 to cure and reinstate a mortgage was a proper reason for a Chapter 11 filing, and that the Bankruptcy Court correctly denied an earlier motion to dismiss on the ground that the debtor's post-petition actions moving toward reorganization amply supported a finding of good faith.

Other courts have likewise found good faith when debtors have filed Chapter 11 to take advantage of various types of relief afforded under Bankruptcy Code that are not otherwise available in state court. For example, in *In re PPI Enterprises (U.S.) Inc., supra,* the Court found good faith in a petition filed primarily to take advantage of the Section 502(b)(6) cap on a landlord's claim. The Court affirmed the Bankruptcy Court's denial of dismissal "[b]ecause PPIE's intention to cap Solow's claim using § 502(b)(6) was not a use of the Code for a purpose for which it was not intended – indeed, PPIE was using § 502(b)(6) for exactly its intended purpose – PPIE's filing does not violate the good faith filing doctrine." *In re PPI Enterprises (U.S.) Inc., supra,* 324 F.3d at 211.

In *In re Rubin Family Irrevocable Stock Trust,* 2013 WL 6155606, *11 (Bankr. E.D.N.Y. 2013), Judge Eisenberg found good faith in the filing of a Chapter 11 petition for the primary purpose of avoiding having to post an appeal bond. ["the Debtors' conduct here does not

evidence an intention *unreasonably* to deter or hinder creditors through abuse of the bankruptcy process, but rather to prevent a chaotic dismemberment of their assets" (internal quotation marks and citations omitted]. Good faith was also found where a contract vendee filed bankruptcy on the eve of a contract default to take advantage of the automatic 60-day contract extension provision of 11 U.S.C. 108. *In re Walden Ridge Development LLC*, 292 B.R. 58, 64 (Bankr. N.J. 2003) ["In summary, the test to be applied by this Court relative to a motion to dismiss is an examination of the totality of the circumstances, not rigid application of specific factors. Here, the Court can find no prejudice to Rizzo nor sufficient circumstances to determine this Petition was filed in bad faith. It is undisputed that the Debtor's motive in filing Chapter 11 was to preserve its Purchase Contract. The preservation of value is a permissible motive for filing Chapter 11 and the good faith requirement must be viewed in context with Congress' intent to promote reorganization"].

### 2.    The Debtor's Conduct Meets the Standard of Objective Good Faith

Insofar as objective good faith is concerned, it is worth reemphasizing that the Buildings have a relatively solid rent roll at this point and can generate cash flow to support a refinancing. Moreover, as set forth above, the timing of the Debtor's filing was based on the need to take affirmative action to address the mortgage, and there is no evidence of any intent to delay or frustrate the legitimate efforts of the Note Buyer to enforce its rights.

Notwithstanding all of the foregoing, the Note Buyer attempts to manufacture a supposed effort by the Debtor to use Chapter 11 to avoid a decision being rendered in the Foreclosure

Action on a pending contempt motion.  The canard of a fear of contempt has no more merit that the underlying contempt motion itself.[3]

As set forth in the Croman Dec., significant effort was made to comply with document demands by the Receiver and explanations were given regarding disposition of rents.  A copy of Mr. Croman's affidavit in opposition to the contempt motion is attached as Exhibit "N" to the Croman Dec.  Additionally, the Note Buyer's accusations also ignore that, in fact, the Debtor consented to the post-petition retention of the Receiver to demonstrate its continued good faith effort to cooperate.  Notably, the Note Buyer has not sought stay relief with regard to the contempt motion, nor has the Receiver made any allegations of a post-petition failure to cooperate.  The contempt was pending for some time before the Chapter 11 filing and is based largely on the fact that early rent collections by the Receiver were substantially below expectations.  The Debtor cannot control expectations, and it is worth noting that in every foreclosure action there is confusion sown when the tenants receive notices first from the lender and then from the Receiver to re-direct their rent payments, with the result that many tenants decline to pay their rent to anyone until a Court order is entered clarifying the proper recipient.

This case is also distinguishable from two other cases relied upon by the Note Buyer, *In re Wally Findlay Galleries (New York), Inc.*, 36 B.R. 849 (Bankr. S.D.N.Y. 1984) and *In re D&G Construction Dean Gonzalez, LLC*, 635 B.R. 232 (Bank. E.D.N.Y. 2021).  In *Wally Findlay,* the debtor lost a motion for summary judgment to its franchisor in state court.  The debtor claimed it was properly using the Chapter 11 case to litigate conspiracy claims against the franchisor and would use the proceeds recovered from the litigation to fund a plan.  The

---

[3]  As part of its effort to sully the Debtor, the Note Buyer uses the alleged contempt together with other disparaging remarks in a continuation of its *ad hominem* attacks on Mr. Croman.  While a great deal of negative comment has been published in the media against both parties, the focus should be on actual evidence of the Debtor's ability to pursue a plan.

Bankruptcy Court noted that those same conspiracy claims had been found to lack merit by the state court in granting summary judgment, and dismissed the petition as a bad faith filing because it was "evident that the debtor seeks to use this court not to reorganize, but to relitigate. This is an impermissible use of Chapter 11". *Wally Findlay Galleries (New York), Inc. supra*, 36 B.R. at 850. Here, no decision has been rendered in the state court on the central issue of the Note Buyer's entitlement to default interest. Accordingly, the Debtor is not attempting to relitigate the mortgage, but rather to restructure it through a cure and reinstatement.

In *D&G, supra*, the debtor was a single asset real estate entity, but the relationship to the Debtor here ends at this point. The debtor in *D&G* was a serial filer on its fourth bankruptcy filing under Chapters 7, 13 and 11, with no income, no prospects for reorganization and was acting in such bad faith that the Court not only dismissed the case but sanctioned the debtor and its attorney under Rule 9011. Again, the facts presented here come nowhere near those relied on by the Note Buyer.

### 3.    The Debtor Also Meets the Standard of Subjective Good Faith

Of course, it is not only necessary that the Debtor to intend to use the Bankruptcy Code in good faith, the Note Buyer must also demonstrate that the Debtor has no reasonable possibility that it will emerge from bankruptcy. *In re 68 West 127th Street LLC, supra*, 285 BR. at 846

In this regard, the primary focus of the Note Buyer is on its completely unfounded allegations that the Debtor cannot possibly fund and confirm a plan of reorganization before maturity. The Note Buyer undersells the Debtor's resources. The Croman family is committed to obtaining a refinancing and has substantial financial resources and real estate contacts to accomplish this.

17

In the meanwhile, there are substantial funds on hand. Prior to the appointment of the Receiver the Debtor collected rents and initially deposited $1,514,133.04 with its bankruptcy counsel. These rents should remain in escrow and can properly be used for plan purposes. Subsequently the Debtor consented to the turnover of $611,347.34 to cover post-petition taxes which came due on January 1, 2023 as well as certain pre-petition utility bills of some $80,000, leaving the balance of escrowed funds in the amount of $902,785.70. Together with the $1,683,483 collected by the Receiver net of the payment of the January real estate taxes, there is a $2,786,269 base available to fund the initial payments.

The Debtor will seek as much as $25 million more from a refinancing, which is sufficient to fund the cure of the undisputed portion of the Note Buyer's claim and escrow the disputed portion pending a determination of entitlement. The Note Buyer scoffs at the Debtor's ability to refinance but ignores that the Debtor lost out on refinancing last summer because the parties could not agree on a fair resolution of default interest default interest, and not because the Debtor was unable to obtain a potential lender.

While the Note Buyer questions the Debtor's ability to confirm such a plan, the proof, as they say, is in the pudding. At this juncture, there is sufficient evidence to support that the Debtor has a reasonable exit strategy. In turn, questions of feasibility can and should be determined in the context of the confirmation process, which the Debtor intends to commence before the maturity date of the mortgage.

## Conclusion

For all of the foregoing reasons, the Motion should be denied.

Dated: New York, New York
January 24, 2023

Goldberg Weprin Finkel Goldstein LLP
*Attorneys for the Debtor*
Kevin J. Nash, Esq.
J. Ted Donovan, Esq.
125 Park Avenue – 12th Floor
New York, New York 10017
(212) 221-5700

By:    /s/ Kevin J. Nash